**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

In re:

| | |
|---|---|
| Starboard Group of Space Coast, LLC | Case No. 6:23-bk-04789 |
| Starboard Group of Southeast Florida, LLC | Case No. 6:23-bk-04791 |
| Starboard Group of Tampa, LLC | Case No. 6:23-bk-04790 |
| Starboard Group of Tampa II, LLC | Case No. 6:23-bk-04793 |
| Starboard Group of Alabama, LLC | Case No. 6:23-bk-04792 |
| Starboard with Cheese, LLC | Case No. 6:23-bk-04796 |
| 7 S&M Foods, LLC | Case No. 6:23-bk-04798 |
| 9 S&M Foods, LLC | Case No. 6:23-bk-04800 |
| 10 S&M Foods, LLC | Case No. 6:23-bk-04802 |
| SBG Burger Opco, LLC; | Case No. 6:23-bk-04797 (Lead Case) |

Debtors.                                                                 Chapter 11 – Jointly Administered
_____/

**AMENDED[1] DECLARATION OF ANDREW LEVY IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Under 28 U.S.C. § 1746, I declare the following:

**A.      Competency and Familiarity.**

1.       My name is Andrew Levy.  I am the principal and responsible person for Starboard Group of Space Coast, LLC ("**SBG Space Coast**"); Starboard Group of Southeast Florida, LLC ("**SBG Southeast**"); Starboard Group of Tampa, LLC ("**SBG Tampa**"); Starboard Group of Tampa II, LLC ("**SBG Tampa II**"); Starboard Group of Alabama, LLC ("**SBG Alabama**"); 7 S & M Foods, LLC ("**7SMF**"); 9 S & M Foods, LLC ("**9SMF**"); 10 S & M Foods, LLC ("**10SMF**"); Starboard with Cheese, LLC ("**SBG Cheese**") and SBG Burger Opco, LLC ("**SBG Burger**") (collectively, the "**Debtors**").

---

[1] Amended to reference location of Exhibit Filings.

2.      I am familiar with the matters set forth herein and make this *Declaration of Andrew Levy in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**Declaration**") and state as follows:

3.      I am over the age of 18 and competent to testify to the matters set forth herein.

4.      On November 14, 2023 (the "**Petition Date**"), the Debtors each filed a Voluntary Petition for Relief (the "**Petitions**") under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the Middle District of Florida.

5.      The Debtors have leases for seventy (70) Wendy's restaurants.  Immediately prior to filing these bankruptcy cases, the Debtors closed nine (9) locations, though the Debtors still possess those leases.  The Debtors previously closed two additional locations within the weeks prior to bankruptcy with the consent of Wendy's.  The Debtors operate approximately fourteen (14) of those stores near the greater Orlando, Florida area, including those by SBG Space Coast. These Orlando locations are collectively the most profitable in the Debtors' overall portfolio.

6.      The Debtors intend to operate their businesses and manage their assets as debtors in possession as defined under the Bankruptcy Code.  The Debtors anticipate analyzing the possibility of closing additional stores that are a drain on profits or require substantial capital expenditures mandated by the Wendy's franchisor to renovate restaurants as part of its Image Activation Project.

7.      The Debtors' value, and the creditors recovery in this case, is intimately tied to the ongoing operations of the Wendy's restaurants (or at least, in the longer term, the profitable locations).  Any period of ceasing operations or other interruption in ongoing business could result in a substantial loss of the Debtors' businesses.

8.      To minimize the adverse effects of filing the Petitions, the Debtors prepared and filed, or intend to file, with the assistance of their proposed bankruptcy counsel, motions and applications as discussed herein, seeking "first day" relief (collectively the "**First Day Motions**"). Through the First Day Motions, the Debtors seeks authority from the Court to allow the Debtors to fulfill their duties under the Bankruptcy Code and effectively administer these bankruptcy cases.

**B.      Overview of the Debtors and Circumstances Necessitating the Filing of the Petitions.**

9.      The Debtors collectively still operate 61 Wendy's stores across Florida, Alabama, Illinois, Missouri and Wisconsin.  These store locations are summarized on the attached **Exhibits A and B**, respectively of the Case Management Statement (Doc. No. 13).

10.     Shortly prior to filing, the Debtors closed nine (9) stores listed on **Exhibit C** of the Case Management Statement.  Those stores collectively accounted for approximately $1.5 million of annual losses (out of approximately $2 million in losses by unprofitable restaurant locations).

11.     The Debtors are parties to several individual franchise agreements for the operation of Wendy's branded restaurants (collectively the "**Franchise Agreements**").  The operations of the Wendy's restaurants are the sole source of revenue for each of the Debtors.  Pursuant to the Franchise Agreements, each of the Debtors is required to remit a percentage of gross sales revenue to Wendy's in exchange for the right to operate a Wendy's branded franchise ("**Royalty Payment**").  The Franchise Agreements also require that the Debtors contribute additional amounts, calculated as a percentage of gross revenue, to assist in funding advertising campaigns promoting Wendy's products (the "**Advertising Contributions**").  The Franchise Agreements further require that the Debtors make certain capital improvements, maintain certain operational and quality standards, and purchase supplies from specified vendors.

12.     None of the Debtors own real property, but instead lease the real property on which they operate.

13.     The Debtors operate pursuant to management agreements (collectively, the "**Management Agreements**") with non-debtor affiliate Starboard Group Management Company Incorporated ("**SBG Management**").

14.     Pursuant to the Management Agreements, SBG Management provides administrative, supervisory and management services with respect to the operations of the Wendy's restaurants as well as non-Wendy's restaurants owned by affiliates with proportionate cost sharing.

15.     In return, SBG Management earns a management fee percentage based on the gross revenues earned at these locations.

16.     Since 2015 Starboard Group Employment Services Inc. ("**SBG Employment**") has provided employment services for all applicable employees.  These services include employment and placement of restaurant staff, collection of employee data and maintenance of records, employment eligibility verification, collection of funds from the operating entities and payment of wages, and benefits, management.

17.     SBG Employment does not receive any additional fees for the performance of its services.

**C.      Reasons for Filing Chapter 11.**

18.     The Debtors each filed a voluntary petition on November 14, 2023 (the "Petition Date"), under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

19.    The quick serve restaurant market, as a whole, makes up around 40% of the total restaurant market.  Of these, Wendy's has a collective market share of 2.5%, or approximately 5,994 stores in the United States alone.

20.    Wendy's operations were not immune from the macroeconomic impacts that emanated following Covid-19.  Wendy's operations on a global level experienced difficulties including disruptions to its supply chain, hyperinflation effecting food, labor, and food delivery costs , and breakfast stagnation and decreased customer levels. Wendy's is not alone in suffering from financial difficulties during this same time period.  Burger King and other fast-food retailers across the country have also continued to suffer, and other franchisees and franchisors have closed stores or filed chapter 11 to restructure their operations.[2]

21.    Above and beyond general industry trends, these Debtors had several factors converge necessitating the filings.  First, in 2015 Starboard International Holdings B.V. had a 40% interest in a joint venture (along with the Wendy's franchisor at 20% and a local Brazilian partner at 40%) developing the initial Wendy's locations in Brazil.  However, the stores had massive losses, in part because they were overly posh, which alienated a portion of the market while simultaneously requiring huge capital investment.   This strained the remaining Debtors' management contracts and fees.  Second, at the behest of the franchisor, affiliates Starboard Group of Richmond North, LLC and Starboard Group of Richmond South, LLC (collectively, "Starboard

---

[2] See, e.g., "Another Fast Food Operator Files for Bankruptcy") https://www.thestreet.com/restaurants/another-fast-food-operator-files-chapter-11-bankruptcy (Burger King Franchisee) (November 10, 2023); "Fast Food Franchisee Bankruptcies Portend Industrywide Struggles" (Bloomberg),(May 5, 2023).
https://news.bloomberglaw.com/bankruptcy-law/fast-food-franchisee-bankruptcies-portend-industrywide-struggles;
"5 Restaurant Chain Bankruptcies That Are Shaking the Industry in 2023", https://www.eatthis.com/restaurant-bankruptcies-2023/ (June 7, 2023) (referencing Happy Joe's Pizza, Bertucci's Brick Oven Pizza, Burger King, Hardee's, Popeye's, Corner Bakery, and even McDonald's.
*See also In re: NPC International, Inc.* and its jointly administered debtors, Case No. 20-33353 (DRJ), United States Bankruptcy Court, Southern District of Texas, Houston Division (chapter 11 bankruptcy of franchisee of just under 400 Wendy's restaurants, along with another 1,200 Pizza Hut locations).

Richmond") were sold in 2020.  These two operators had attractive, profitable portfolios and their departure meant the remaining locations' share of the aggregate management costs increased with less average profits per remaining location.  Third, Wendy's required all stores to extensively remodel, including their bathrooms and in-dining experiences, requiring substantial capital expenditures that have modest or no equivalent returns.  The Debtors have paid for and constructed many of these remodels, but many remain.

22.    To combat these forces, in December of 2020 SBG Space Coast, SBG Southeast, SBG Tampa, SBG Tampa II, SBG Alabama and Starboard Richmond undertook a Main Street loan facility from City National Bank and received $49,755,000 in loan proceeds.  In February of 2021, the Debtors and City National Bank executed an amendment to release Starboard Richmond, the two Virginia companies that were required to sell franchise locations.  Beginning in 2022, the Debtors commenced making monthly interest-only payments.  These significant payments, in conjunction with depressed sales and increased interest rates, have stressed the Debtors' financial portfolio.

23.    In addition, the Debtors have significant monthly operating expenses including franchise fees and lease payments.  As part of the Debtors' bankruptcy cases, in addition to prepetition closures, the Debtors anticipate potentially closing additional underperforming stores, or stores with large remaining remodel obligations to effectively restructure and emerge from bankruptcy.

D.    **Secured Debt and Cash Collateral.**[3]

24.    A search of the Florida Secured Transaction Registry reveals the following UCC-1 financing statements:

| Date | Debtor(s) | Creditor | Instrument No. | Extent of Lien |
|---|---|---|---|---|
| 10/19/2012 | SBG Southeast | Fifth Third Bank | 201207741416 | Satisfied |
| 3/13/2015 | SBG Space Coast | Bridge Funding Group, Inc. | 201503262500 | Satisfied |
| 3/13/2015 | SBG Space Coast | Corporation Services Company, as Representative | 201503262616 | Satisfied |
| 3/31/2015 | SBG Cheese | MidCap Funding | 201503369747 | Blanket Lien |
| 6/29/2015 | SBG Cheese | MidCap Funding | 201504259120 | Equipment |
| 7/14/2015 | SBG Cheese | MidCap Funding | 201504404759 | Equipment |
| 12/21/2020 | SBG Space Coast, SBG Southeast, SBG Tampa, SBG Tampa II | City National | 202005667151, 20200566716X 202005667186, 202005667178 | Blanket Lien |

25.    In addition, a search of the Alabama Secretary of State UCC Records reveals the following UCC-1 financing statements:

| Date | Debtor(s) | Creditor | Instrument No. | Extent of Lien |
|---|---|---|---|---|
| 12/26/2012 | SBG Alabama | Fifth Third Bank | 13-0006529 | Satisfied |
| 12/21/2020 | SBG Alabama | City National | 20-0663023 | Blanket Lien |

26.    SBG Southeast and SBG Alabama believe the obligations to Fifth Third Bank, National Association, as Administrative Agent ("**Fifth Third Bank**") have been satisfied by the Main Street loan, as evidenced by filed termination statements in both Florida and Alabama.  The amendments and continuation statements filed thereafter appear to have been in error.  Therefore, these Debtors do not believe that Fifth Third Bank has any interest in cash collateral.

---

[3] Nothing herein is intended to adjudicate, resolve or determine the nature, amount or interest of any party's security interest or claim as of the Petition Date and all rights are reserved to address such claims and interests throughout the course of this case.

27.    SBG Space Coast believes the obligations to Bridge Funding Group, Inc. ("**Bridge Funding**") have been satisfied by the Main Street loan, but no termination statement was filed. Therefore, SBG Space Coast does not believe that Bridge Funding has any interest in cash collateral.

28.    SBG Space Coast's obligation with Corporation Service Company, as Representative ("**CSC**"), was secured by equipment only.[4]    Therefore, Corporation Service Company, as representative, has never had any interest in cash collateral.  Furthermore, SBG Space Coast believes this obligation has been satisfied.

29.    The obligations concerning MidCap Funding Franchise Finance Trust ("**MidCap Funding**") relate to 2015 loans, later consolidated, in the original aggregate principal amount of $6,400,000 to finance SBG Cheese's acquisition of the Wendy's lease, franchise, and equipment rights to nine current locations as well as remodeling funds for several of the sites.

30.    MidCap filed its financing statements asserting a blanket lien as well as specific equipment liens.

31.    The obligations concerning City National Bank of Florida ("**City National**") relate to a 2020 Main Street Priority Loan Facility in the original principal amount of $49,755,000.  This was in the wake of the COVID-19 pandemic and undertaken to stabilize operations.

32.    City National filed its financing statements asserting a blanket lien.

33.    The Debtors believe they owe approximately (i) $2,833,826.02 to MidCap Funding and (ii) $48,806,028.82 to City National.

---

[4] Specifically, NCR Accuview order confirmation boards, vertical toasters with butter rollers and radiant systems POS units.

34.     Other than MidCap Funding and City National, the Debtors do not believe any other party has a secured interest.  The Debtors intend to use cash collateral to pay operating expenses and costs of administering this chapter 11 case, and they will seek separate authority to do so.

35.     On a daily basis the cash holdings of the Debtors are transferred to SBG Holdings daily.  Holdings then distributes funds to Management and Employment and back to the operating entities to fund operational expenses and payroll.  Frequently over the last several years, SBG Holdings has had to fund operational losses and payroll from other, non-Wendy's sources and from profitable Wendy's locations to support non-profitable Wendy's locations.

36.     The prepetition bank accounts of SBG Cheese contained ($49.90) as of the petition and had overnight, pending deposit activity of $40,045.03 (or a total pending credit balance of $39,995.08).  The prepetition bank accounts of the Debtors subject to City National's lien contained a combined $71,726.68 and pending activity of $62,0911.92 (or a total pending credit of $133,738.80) as of the petition date.  The combined prepetition bank accounts of 7SMF, 9SMF, and 10SMF contained $2,755.3 and pending activity of -$2,218.98 (or a total pending credit of $536.32) as of the petition date.

37.     I, along with other employees and consultants of the Debtors, assisted in the preparation and submittal of the attached 16-week projections for the Debtors, attached as **Exhibit C** to the Debtor's motion to approve post-petition financing.  (Doc. No. 9).

38.     Further, I am familiar with the First Day Motions and their exhibits as set forth below, I assisted in the preparation of these pleadings and exhibits, and affirm that they are valid and accurate to the best of my knowledge.  If I become aware of any inaccuracies or needs for correction, I will notify the Court.

**E.       Facts Supporting First Day Motions and Applications**

39.       I am familiar with the content of the First Day Motions and, to the best of my knowledge after reasonable inquiry, believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to smoothly transition into chapter 11 with minimal disruption; (ii) is critical to the Debtors' efforts to preserve their value and maximize creditor and stakeholder recoveries; and (iii) is in the best interest of the Debtors' estates.  Further, it is my belief that the relief sought in the First Day Motions is tailored and necessary to achieve the goals of these cases.

*I.       Administrative Motions*

*a.   Application to Employ Scott A. Underwood and law firm of Underwood Murray, P.A.*

40.       The Debtors will be seeking authority to employ Underwood Murray, P.A. ("**Underwood Murray**") post-petition as general bankruptcy counsel.

41.       The Debtors are required to be represented by counsel in proceedings before this Court.  Prior to the filing of the Petitions the Debtors engaged the services of Underwood Murray to assist the Debtors with the preparation and filing of the Petitions, among other pre-petition legal assistance.  I believe that Underwood Murray is well suited to assist the Debtors in navigating the bankruptcy process and the Debtors require the assistance of counsel immediately to appear and be heard by the Court.

42.       I believe that the Debtors' employment of Underwood Murray is in the best interests of the estate as it will allow for the Debtors to appear before this Court and be heard.

**b. Administrative Relief for (i) Debtors' Application for Entry of an Order (A) Authorizing the Retention and Appointment of Stretto, Inc. as Claims, Noticing, and Solicitation Agent and (B) Granting Related Relief; (ii) Debtors' Emergency motion to Establish Combined Creditor Matrix and to Establish Notice Procedures; and (iii) Debtors' Ex Parte Emergency Motion for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only.**

43. There are 10 Debtors, each with voluminous creditor matrices and substantial operational focus. Accordingly, the Debtors anticipate administratively burdensome and cumbersome tasks which they are seeking to mitigate through experienced professionals.

44. First, the Debtors seek to employ Stretto, Inc. ("**Stretto**") as their claims, noticing and solicitation agent. Stretto's experience and qualifications will help organize and streamline these processes across the Debtors and across their various creditors, helping to reduce the overall administrative burden on the Debtors' respective estates.

45. Second, the Debtors are seeking approval to establish an overall consolidated creditor matrix, combined 20 largest creditor matrix and limited notice procedures in general. The vast majority of the creditors in these cases overlap, causing potential duplication of resources and greater service than otherwise necessary to properly notice constituents of these estates.

46. These measures will help limit the administrative cost and time associated with providing notices in these cases without sacrificing the integrity of the notice system overall. That's because creditors who have filed claims, filed notices of appearance or other papers, are directly impacted by the relief or most importantly opted to stay in will still receive notices.

47. Third, the Debtors are requesting the entry of an order directing joint administration of the bankruptcy cases for procedural purposes only.

48.     This will expedite the administration of these cases and reduce administrative expenses without prejudicing any creditor's substantive rights because the Debtors are not seeking substantive consolidation of their estates.

## II.     Business Operation Motions

### a.    Debtors' Emergency Motion for Use of Cash Collateral

49.     On a daily basis the cash holdings of the Debtors are transferred to SBG Holdings. Holdings then distributes funds to Management and Employment and back to the operating entities to fund operational expenses and payroll.  Frequently over the last several years, SBG Holdings has had to fund operational losses and payroll from other, non-Wendy's sources and from profitable Wendy's locations to support non-profitable Wendy's locations.

50.     The Debtors will be seeking authority to use cash collateral to fund their operations and the costs of administering these chapter 11 cases in accordance with a proposed budget.

51.     In exchange for the Debtors' ability to use cash collateral in the operation of their business, the Debtors propose to grant as adequate protection to MidCap Funding and City National (collectively the "**Cash Collateral Creditors**") replacement liens on the Debtors' post-petition assets and cash collateral to the same extent, priority and validity as any pre-petition liens, to the extent the Debtors' use of cash collateral results in a decrease in value in the cash collateral, although all such liens would be subject to the relief sought in the Debtor's request for authority to incur post-petition financing.

52.     The use of Cash Collateral is essential to preserving the Debtors' value as a going concern for the benefit of all constituents.  Even if there is a diminution in the Debtors' cash on hand at various times or subordination of such cash to debtor-in-possession financing, the

preservation of other collateral value for creditors far outweighs such potential losses and further protects the economic interests beyond cash collateral.

53.  If the Debtors are not permitted to use cash collateral, they may be forced to halt operations which could result in the loss of the going concern of the business and the Debtors' assets and adversely affect the Debtors' creditors including the Cash Collateral Creditors.

54.  The Debtors would utilize cash collateral consistent with the terms of a cash collateral order and the Budget (defined below).[5]

55.  However, if allowed to use cash collateral, the Debtors believe that they can stabilize their business operations and maintain going concern value.

**b.  *Debtors' Emergency Motion to Approve Debtor in Possession Financing* (the "DIP Motion").**

56.  Through the DIP Motion, the Debtors are seeking authority for a debtor in possession financing facility (the "**DIP Facility**" with PNX Solutions, LLC (the "**DIP Lender**") in the amount of $1,000,000 which will consist of initial draw of up to $900,000 sufficient to pay items critical to the Debtors' ongoing operations during the initial stages of the Debtors' bankruptcy cases.  Among the items anticipated to be funded through the DIP Facility are the Debtors' first post-petition payroll, certain critical vendor payments, and operational expenses for which current operating income is insufficient to fund.  Given the short time frame in which it was determined that the Debtors would need to reorganize their financial affairs, the Debtors were unable to secure third-party debtor-in-possession financing prior to the Petition Date.  The Debtors

---

[5] One of the line items in the Budget is for insurance.  The insurer is Affinity, which insurer is owned collectively by its non-affiliated members.  Here, Starboard Administrative Services, LLC, is a common shareholder of Affinity, and Starboard Group Holdings, LLC is a preferred shareholder in Affinity.  These shares represent one of many shareholder interests held by other insured businesses with no connections to the Debtors.

agents did contact and speak with at least one alternative DIP lender that was not initially willing to fund absent and until a priming lien could be provided on a final basis.

57.     The Debtors will endeavor to continue seeking alternative financing on a final basis that would take out any interim DIP Facility.

58.     In determining the Debtors' need for the DIP Facility, I along with the other members of the Debtors' management team have analyzed the Debtors' operations, financial performance, and books and records to evaluate the Debtors' liquidity positions and determine potential operational shortfalls.  Through this analysis, the Debtors have developed a 16-week budget demonstrating the projected cash flow of the Debtors over this 16-week period (the "**Budget**").  The Budget, which is attached as an Exhibit to the DIP Motion is anticipated to provide sufficient post-petition financing to allow the Debtors to continue operating in the ordinary course of business and administer these Chapter 11 cases.

59.     Based on my, and the Debtors' managements', review and analysis of the Debtors' current cash position and needs, I believe that the Debtors require an immediate capital infusion in the form of the DIP Facility in order to operate their business post-petition and to preserve the Debtors' estates as going concerns.  As demonstrated by the Budget, it is my belief that the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these Chapter 11 cases absent immediate funding.

60.     Specifically, the Debtors require the funding available from the DIP Facility in order to, among other needs, fund working capital, meet payroll obligations, pay suppliers, cover overhead costs, make payments to critical vendors, fund administrative expenses being incurred, and make any other payments that are essential for the continued management, operation, and

preservation of the Debtors' business. The ability to make these payments when due is essential to the continued operation of the Debtor's business during the pendency of these Chapter 11 cases. Specifically, during the first 3 weeks of the Debtors' case, the Debtors need access to up to $900,000 of the DIP Facility to pay, among other obligations, key payments contemplated by the Budget. And it is my belief that such expenses are critical to the Debtors' business and that the Debtors' failure to make such payments will result in immediate and irreparable harm to the Debtors and their estates.

61.     If the Debtors cannot quickly access the DIP Facility, based on the Debtors' financial forecasts and the Budget, the Debtors will not be able to operate their business in the ordinary course until the hearing on the Final Order (as defined in the DIP Motion). In turn, this would negatively impact the Debtors' revenue, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders. Based on the Debtors' financial forecasts and the Budget, the liquidity provided by the DIP Facility should allow the Debtors to continue their business operations and focus on the chapter 11 restructuring process and maximize recovery to creditors.

62.     Without access to the DIP Facility, the Debtors could face a severe interruption of their business, lose the support of key constituencies, including the Debtors' workforce, and irreplaceable suppliers, and could therefore significantly impact the Debtors' operations in an adverse manner.

### c. Debtors' Emergency Motion for Authorization to Pay Prepetition Wages, Salaries, and Other Employee Benefits.

63.     As of the Petition Date, the Debtors employed 1,865 non-affiliate employees and will be seeking authorization to pay prepetition employee-related obligations including, but not

limited to, wages, salaries, field bonuses, other employee benefits totaling approximately $1,466,760.00 and their related tax obligations of an additional $124,675.00.

64.     In addition, the Debtors also request authority to pay these non-affiliate employees' pre-petition wages and related taxes for the stub period of November 13, 2023 (in the approximate amounts of 1/14 the numbers in Paragraph 48 above) which will be included in the Debtors' first post-petition pay run.

65.     Retaining the employees is critical to the successful operation of the Debtors' businesses as the Debtors would not be able to replace these employees without a significant disruption in their business. In short, these employees are vital to the Debtors' continued success. The Debtors cannot afford to lose the support of their employees at a time when the Debtors must operate more efficiently and meet more administrative burdens than before.

66.     Given the timing of any reductions in the Debtors' workforce upon the filing of the Petitions, during the thanksgiving holiday, the Debtors are seeking to pay the pre-petition wages of those all employees. The failure to pay these employees their pre-petition wages during the holiday season could negatively impact the Debtors' public image, and make it difficult to hire employees in the future.

67.     I believe that seeking to pay the aforementioned prepetition obligations is in the best interest of the estate, and these amounts are within the employees' priority claims pursuant to Section 507.

### d. Debtors' Emergency Motion to Pay Critical Vendors.

68.     The Debtors have identified a number of vendors and services providers which are necessary and essential to their continued business operations (the "**Critical Vendors**").

69.     These Critical Vendors include those vendors that supply the Debtors' restaurants

with ingredients and that maintain the Debtors' food preparation equipment.  Both of which are essential to the Debtors ability to continue operating.  Importantly, under the franchise agreements pursuant to which the Debtors' stores are run the Debtors must utilize specific vendors.

70.     If the Debtors fail to pay these Critical Vendors, the Debtors will likely suffer irreparable harm to continued operations.

71.     The Critical Vendors typically supply their customers with services and products on trade terms based on their experience with and perceived risk of conducting business with such customers.

72.     Many of these Critical Vendors are mandated by Wendy's franchise agreements, such that the Debtors do not have the ability to change suppliers without violating franchise agreements that are necessary to the Debtors reorganization and exit from bankruptcy.

73.     The Debtors believe that it would be exceedingly difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe and irreparable harm to the Debtors' business. Such harm would likely far outweigh the cost of payment of the Critical Vendor claims.

74.     Should the Debtors operations go dark, the inevitable damage and potential loss of employees could be catastrophic to the reorganization process.

75.     Given the importance of the goods and services provided by the Critical Vendors, it is imperative that the Debtors are granted the flexibility and authority to satisfy the prepetition Critical Vendor Claims to the extent it has funding to do so and subject to negotiations with such Critical Vendors regarding amounts and timing of payments. The Debtors believes that the Critical Vendor Claims are fair and reasonable for the goods and services provided, and that provided the

accounts receivables are received in the ordinary course and/or the Debtors receive approved post-petition financing the Debtors should be authorized to pay Critical Vendors.

76.     To the extent the Critical Vendors will not provide goods and services without payment of the Critical Vendor claims, a sound business justification exists for the relief requested. Moreover, maintaining favorable trade terms and credit is in the best interest of the estate, all creditors and other parties in interest.

77.     Additionally, there will be no prejudice to other creditors resulting from the Court's authorization of the requested payments to the Critical Vendors requested herein. Such payments are absolutely essential to the Debtors' continued business operations and revenue generation, which benefits all creditors by maintaining the value of the Debtors' operations.

78.     I believe that seeking to pay the aforementioned prepetition obligations of the Debtors' Critical Vendors is in the best interest of the estate.

### e. Debtors' Motion to Determine Adequate Assurance for Payment of Utility Services.

79.      After pre-filing closings, the Debtors currently operate 61 Wendy's restaurants.

80.     In connection with the operation of their businesses, the Debtors obtain electricity, gas, water & sewer, phone & internet, garbage removal, and other similar services (collectively, the "**Utility Services**").

81.     These Utility Services are provided from a variety of utilities providers (collectively the "**Utility Providers**").[6]

---

[6] While the term "utility" is not defined in the Bankruptcy Code, courts have concluded that Section 366 is not limited to public utilities, and that "utility" is meant to be interpreted broadly so as to include entities that occupy "some special position with respect to Debtors, such as an electric company, gas supplier or telephone company that is a monopoly in the area so that Debtors cannot easily obtain comparable services from another utility." H.R. Rep. 595, 95th Cong., 1st Sess. 350 (1977); S. Rep. No. 989, 95th Cong., 2nd Sess. 60 (1978). *See also In re One Stop Realtour Place, Inc.,* 268 B.R. 430, 436-38 (Bank. E.D. Pa. 2001).

82.     Ensuring that the Utility Services continue uninterrupted is therefore critical. The Debtors will seek authority to an objecting Utility Provider to make available, upon request, a one-month deposit equal to the prior month's utility bill to any utility provider who timely demands such additional adequate protection following untimely payment of any utility bill.

83.     I believe that the Motion to Determine Adequate Assurance for Payment of Utility Services is in the best interest of the Debtors' estate and its creditors because it will provide for continued, uninterrupted service at the Debtors' restaurants.

### III.     *Debtors' Emergency Motion for Authorization to Maintain Existing Bank Accounts and Cash Management Systems.*

84.     The Debtors will be seeking authority to maintain their prepetition bank accounts at City National Bank of Florida, and sweep the funds no less than bi-weekly into an approved debtor in possession account(s) for a period of 90 days from the Petition Date.  All bank statements for all accounts will be attached to the Debtors' Monthly Operating Reports.

85.     The Debtor believe the relief requested is reasonable and necessary to maintain a consistent revenue stream to pay ordinary course expenses and is in the best interest of the estates.

86.     In addition, the Debtors are requesting authority to maintain the following cash management system (collectively, the "**Cash Management System**") for a period of 90 days following the Petition Date.

87.     The Debtors receive funds through a variety of services.

88.     Specifically, (i) they have point-of-sale systems tied to their kitchens and franchise reporting, (ii) credit cards are processed through merchant machines and (iii) the Debtors utilize third party delivery services such as Uber Eats.  A disruption to the Cash Management System, particularly the ability of the Debtor to participate in third party delivery services, will significantly hamper the Debtors' revenues during the transition time.

89.     In addition, most of the stores contain  safes that will need to remain to ensure safe keeping of the Debtors' cash.  These safes count the cash as its being deposited into the safes.  That cash is then immediately credited to the Debtors' specific operating account.  Once the cash is moved from the safe to the bank a "true up" occurs and additional credits or debits are posted to the operating accounts accordingly.  The contract for the safes is with the Starboard Group Management Company Incorporated to maximize economies of scale though each Debtor pays its proportionate share of the costs.

90.     Furthermore, the Debtors maintain a customer loyalty program or rewards program. Here, customers received "points" for every dollar they spend at Wendy's, with additional avenues to earn bonus points from time to time.  After accruing enough points customers can trade those in for Wendy's products in lieu of paying cash.[7]  Maintaining and honoring this rewards loyalty program is important to both maintaining the customer base and, thereby, the value of the going concern business, as well as ensuring compliance with the Wendy's franchise agreements.

91.     The Debtors estimate it can take anywhere from 4 to 8 weeks to transfer their bank accounts and cash management systems to new platforms.  Therefore, the Debtors are requesting authority for up to 90 days, without prejudice to seek further extensions, if necessary, to account for the estimated time along with a small cushion should they run into trouble effectuating the change.

92.     I believe that the Emergency Motion for Authorization to Maintain Existing Bank Accounts and Cash management Systems in the best interest of the Debtors' estates and their creditors.

---

[7] For more information regarding the loyalty program see https://www.wendys.com/rewards.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed on November 14, 2023.**

Respectfully submitted,

/s/ Andrew Levy

Andrew Levy
on behalf of Debtors
Starboard Group of Space Coast, LLC
Starboard Group of Southeast Florida, LLC
Starboard Group of Tampa, LLC
Starboard Group of Tampa II, LLC
Starboard Group of Alabama, LLC
7 S & M Foods, LLC
9 S & M Foods, LLC
10 S & M Foods, LLC
Starboard with Cheese, LLC
SBG Burger Opco, LLC


Dated: November 14, 2023.

Respectfully submitted,
/s/ Scott A. Underwood
Thomas M. Messana
Florida Bar Number 991422
Scott A. Underwood
Florida Bar Number 730041
Daniel E. Etlinger
Florida Bar Number 77420
UNDERWOOD MURRAY, P.A.
100 N Tampa, Ste. 2325
Tampa, FL 33602
(813) 540-8401
Email: tmessana@underwoodmurray.com
        sunderwood@underwoodmurray.com
        detlinger@underwoodmurray.com
*Proposed Counsel to the Debtors*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing, that was filed with the Clerk of Court, has been furnished electronically to those parties registered to receive service via CM/ECF, on November 14, 2023, including the United States Trustee, who is registered to receive electronic notices in this case, and will be mailed on November 15, 2023 to via First Class U.S. Mail to parties on the attached Consolidated List of 20 Largest Unsecured Creditors, which includes the Local Rule 1007-2 parties in interest. The Debtors also served any creditor which may assert a secured interest above and the United States Trustee as follows:

Fifth Third Bank, National Association, as Administrative Agent
999 Vanderbilt Beach Road 1Mobbe,
Naples, Florida 34108
(239) 354-5696

Bridge Funding Group, Inc.
215 Schilling Circle, Suite 100
Hunt Valley, Maryland 21030
dmckew@bankunited.com
(800) 928-8537

Corporation Service Company, as Representative
12540 West Atlantic Boulevard
Coral Springs, Florida 33107
(866) 403-5272

MidCap Funding Franchise Finance Trust
c/o MidCap Financial Services, LLC
Attention: Account Manager for Starboard with Cheese Transaction
7255 Woodmont Avenue, Suite 300
Bethesda, Maryland 20814
notices@midcapfinancial.com
legalnotices@midcapfinancial.com
(301) 760-7600

City National Bank of Florida
Attention: Legal Department
100 S.E. 2nd Street, 13th Floor
Miami, Florida 33131
legaldepartment@citynational.com
(305) 448-6500

Office of the United States Trustee
George C Young Federal Building
400 W. Washington Street
Suite 1100
Orlando, FL 32801

                                 /s/ Scott A. Underwood
                                 Scott A. Underwood